**Billie Jean PARKER et vlr, Appellants,**

**v.**

**TRADERS & GENERAL INSURANCE COMPANY et al., Appellees.**

**No. 3775.**

Court of Civil Appeals of Texas.

Eastland.

March 15, 1963.

Rehearing Denied April 5, 1963.

Alfred M. Scott, Austin, John O. Harris, Coleman, for appellants.

Turner & Seaberry, Eastland, McMahon, Smart, Sprain, Wilson & Camp, Abilene, Will Wilson, Atty. Gen., Austin, for appellees.

COLLINGS, Justice.

Billie Jean Bell was the original plaintiff herein, and after her marriage was joined pro forma by her husband Mack O. Parker in this suit against Traders and General Insurance Company, Texas Employers' Insurance Association and the Industrial Accident Board of the State of Texas, seeking to recover death benefits under the Workmen's Compensation Act on account of the accidental death of Henry E. Ford in Coleman County on September 12, 1954. Mrs. Parker alleged that she was an adopted child of the deceased Henry E. Ford; that at the time of his death Mr. Ford was an employee of Coleman County Electric Cooperative, Inc., and/or Maxwell Drilling Company and was then engaged in the course of his employment with such employers.

In the pleadings of Traders & General Insurance Company, the insurance carrier for Coleman County Electric Co-operative, Inc., it was alleged that Ford at the time of his death was an independent contractor or alternatively was an employee of Maxwell Drilling Company. The defendant Texas Employers' Insurance Association, the insurance carrier for Maxwell Drilling Company, alleged that Ford at his death was an independent contractor or alternatively was an employee of Coleman County Electric, Inc. All of the defendants denied that Mrs. Parker was an adopted daughter of Ford. Upon trial before a jury it was found that Mrs. Parker was not the adopted daughter of Ford; that Ford, at the time of his death was not working as an independent contractor, but was both an employee of Coleman County Electric, Inc., and a borrowed employee of Maxwell Drill-ing Company and that he received his fatal injuries in the scope of both employments.

Texas Employers' Insurance Association presented motions to disregard the findings that Ford was a borrowed employee of Maxwell Drilling Company and engaged in such employment at the time of his death, and to grant it judgment, notwithstanding, the verdict. Such motions by Texas Employers' Insurance Association were granted, judgment was entered against Mrs. Parker and her husband on their claim, and judgment entered for the Industrial Accident Board against Traders & General Insurance Company in the sum of $1,500.00. Mrs. Parker and her husband have appealed. Traders & General Insurance Company has perfected an appeal from that portion of the judgment adverse to it and filed a brief as appellee in regard to the appeal by Mrs. Parker and her husband.

It is not contended that there was a statutory adoption of Billie Jean Bell by Ford. Special issues 10 through 18 relate to the question of whether or not Billie Jean Bell had been adopted by Ford by estoppel. The jury found in answer to special issue number 13 that Ford had treated, reared and cared for Billie Jean Bell as if she were his daughter; to special issue number 14 that she had rendered to Ford obedience, love, affection, duties and service of a child to a father; to special issue number 16 that Ford had exercised parental control and authority over her, but found in answer to special issue number 17 that such control and authority was not continuous, exclusive or without interruption by others. In answer to special issues numbers 10, 11 and 12 it was found by the jury that Ford never agreed to adopt Billie Jean Bell and to special issue number 15 that Billie Jean's mother did not permanently surrender to Ford her parental authority and control. The Parkers contend that the court erred in overruling their motion to disregard the findings of the jury in answer to special issues numbers 10, 11, 12, 15 and 17. They contend

that the evidence shows an equitable adoption as a matter of law and that the court therefore erred in entering judgment against them. We cannot agree with this contention.

■ The burden of proof to show that Mrs. Parker was an adopted child of Ford was on the Parkers and the special issues concerning that question were so submitted. The evidence does show without dispute that Mrs. Parker's mother was a sister to Ford and that after her mother's divorce from her father, Mrs. Parker lived for several years in the same house with Ford and his parents. There was evidence to the effect that Mrs. Parker's mother also lived for a time after her divorce in Henry Ford's home, and that Ford stated his intention to adopt Billie Jean Bell, (now Parker). The evidence further shows, however, that Mrs. Parker's grandmother, Ford's mother, was the principal person who took care of her after the divorce and that her grandfather was listed as her parent or guardian for school purposes. There was evidence to the effect that while living with her uncle she was not called Billie Jean Ford but kept the name Billie Jean Bell. When Ford died his estate did not go to Mrs. Parker but was divided among his brothers and sisters. Mrs. Parker's letter to the Industrial Accident Board indicated that Ford was her uncle and made no claim of any other relationship between them. Mrs. Parker's testimony and other testimony in her behalf concerning an equitable adoption by Ford was not "clear, unequivocal and convincing" to the effect that there had been such an adoption. See Cavanaugh v. Davis, 149 Tex. 573, 235 S.W. 2d 972. Mrs. Parker in effect admitted that she had previously stated she was only claiming that her uncle had supported her and not that he had adopted her. Mrs. Parker's mother who had testified that Ford intended to adopt her daughter filed the claim for compensation in 1954 and in listing the names of beneficiaries stated only that Billie Jean Bell was a niece of Ford and did not indicate that she was an adopted

daughter. The social security payment to Ford's estate went to his brothers and sisters and not to Billie Jean Bell. The evidence in our opinion does not, conclusively and as a matter of law, show an adoption by estoppel. The court did not err in entering judgment against the Parkers in accord with such findings of the jury.

■ The Parkers urge other points in which it is contended that the court erred in permitting Traders & General Insurance Company and Texas Employers' Insurance Association six peremptory challenges each and in allowing them to confer with each other in regard to the exercise of such challenges. These points are not well taken. Both insurers denied liability claiming that Ford was an independent contractor, and denied liability to the Parkers on the theory that there had been no adoption, but each pleaded and contended in the trial court that if there was any liability under the Workmen's Compensation Act that the other defendant was the liable carrier. Their interests were conflicting. Under these circumstances each company was entitled to six challenges. Rule 233 Rules of Civil Procedure; Texas Employers' Insurance Association v. Baker, Tex. Civ.App., 278 S.W.2d 419, (Ref.N.R.E.); Gussett v. Nueces County, 235 S.W. 857, (Tex.Com.App.); Alaga v. Stubblefield, Tex.Civ.App., 174 S.W.2d 627. The attorneys for such defendants were likewise entitled to confer with each other in the exercise of such challenge. First National Bank v. San Antonio & A. P. R. Co., 97 Tex. 201, 77 S.W. 410; City of San Antonio v. Reed, Tex.Civ.App., 192 S.W. 549, (error refused); Edwards v. West Texas Hospital, Tex.Civ.App., 107 S.W.2d 729 (writ dismissed.).

■■ We also overrule points urged by the Parkers contending that the court erred in refusing to disqualify Martha L. Morris and Donald J. Hart as prospective jurors. Article 2134 Vernon's Ann.Texas Civ.St. sets out the qualifications for jurors and

neither of the prospective jurors was disqualified under this statute. The Parkers' contention that such veniremen were disqualified is based upon the fact that the evidence shows that one of them was an employee of Coleman County Electric Co-operative, Inc., and that the other was regularly engaged in the business of conducting an insurance agency. There was no evidence that either of the veniremen or the Coleman County Electric Co-operative, Inc., was financially interested in any way in the outcome of the suit although Traders & General Insurance Company was its compensation insurance carrier. Both veniremen stated that they had no preconceived opinions which would influence their decision and each believed he could make a fair and impartial juror. The rule in such cases is stated in Bennett v. Jackson, Tex.Civ. App., 172 S.W.2d 395, (error refused), "A challenge for cause not based on any ground mentioned in the statute is ordinarily addressed to the sound discretion of the trial judge whose action thereon should not be disturbed on appeal unless it clearly appears that a fair and impartial trial was thereby prevented."

In the Parkers' 13th point it is contended that the court erred in refusing to permit counsel for the Parkers to call C. L. Newton, Leo Brandt, M. D. Snow, Austin N. Erwin and S. C. McKinley as adverse witnesses under Rule 182 V.T.R. C.P. because they were employees of either Coleman County Electric Co-operative or Maxwell Drilling Company. Neither Coleman County Electric Co-operative nor Maxwell Drilling Company are parties to this suit. The defendant insurance companies herein are their compensation insurance carriers but Rule 182 applies to parties only and such witnesses are not officers or agents of such defendants. The point is overruled.

Mrs. Parker claims to be the adopted child of Henry Ford deceased. Mrs. Phelps, Billie Jean Bell Parker's mother testified that she had considered Billie Jean to be Henry Ford's daughter and heir for some thirteen years prior to his death; that she knew that Billie Jean as an adopted daughter would be his only heir and would stand in the shoes of a natural child, and that since 1941 she had considered Billie Jean to be Henry Ford's child and heir. In numerous points the Parkers contend that the court erred in admitting evidence tending to refute the claim of Billie Jean Bell Parker and to discredit or impeach the testimony of Mrs. Parker's witnesses that she was the adopted daughter of Henry Ford. The evidence complained of consists of testimony and actions of Mrs. Parker, her mother and other relatives who were witnesses for her including claims and papers filed with the Industrial Accident Board which contained statements inconsistent with Mrs. Parker's claim and her mother's testimony that she was an adopted child of Henry Ford. These points are likewise not well taken.

The evidence complained of by the Parkers bears directly on the question of whether or not Mrs. Parker and her said witnesses were during the period in question laboring under the impression and understanding that there had been an agreement between Mrs. Phelps and Henry Ford that Ford would adopt Billie Jean Bell Parker and whether or not Henry Ford did by estoppel make such adoption. The evidence complained of is inconsistent with the idea that Mrs. Parker or her mother Mrs. Phelps had ever considered that there had been an adoption until this law suit was brought. As already indicated such evidence showed that the brothers and sisters of Henry Ford divided his estate between themselves; that Billie Jean Bell Parker neither received nor claimed any portion thereof as an heir. Likewise when Mrs. Phelps, the mother of Billie Jean filed a claim on behalf of Billie Jean with the Industrial Accident Board she indicated that Billie Jean was merely a niece of Henry Ford. Such action on the part of Mrs. Phelps was inconsistent with her testimony on the trial to the effect that Billie Jean was the adopted daughter of

Ford. Billie Jean's conduct in this connection, and her own letter to the Board also indicated that she was Ford's niece and made no claim or mention of any contention that she was an adopted child. Such evidence, refuting the claim of Billie Jean Bell Parker that she was the adopted daughter of Henry Ford, was admissible and it was not error for the trial court to admit it in evidence. The Parkers' contention that papers filed with the Industrial Accident Board setting out statements inconsistent with their claims are not admissible in evidence under the circumstances is untenable. United Employers Casualty Co. v. Smith, Tex.Civ.App., 145 S.W.2d 249 (error refused); Texas Employers' Insurance Association v. Davis, Tex.Civ.App., 228 S.W. 2d 257; Texas General Indemnity Company v. Scott, 152 Tex. 1, 253 S.W.2d 651.

■ The Industrial Accident Board was made a party defendant herein by the Parkers and the Board was an active litigant in the case, seeking recovery against the defendant insurance carrier on behalf of the second injury fund created by the provisions of Article 8306, Section 12c, V.A.T.C.S. Appellant Traders & General Insurance Company excepted to the pleadings of the Parkers and sought to have the Board eliminated as an active litigant. They urge that the court erred in not sustaining their exception and contention in this respect. The point is overruled. It should be noted that the question here involved is not whether it would be proper to permit evidence to go to the jury to the effect that the Board had refused or allowed the claim for compensation, or the amount of its award, if any. The question is whether the Board has the right to be an active litigant. Article 8306, Section 12c, provides for the creation of a special fund known as the "second injury fund", providing for the payment of a specified amount to the Industrial Accident Board in every case of death of an employee under the Workmen's Compensation Act where there is no person entitled to compensation surviving said employee. One of the duties of the Industrial Accident Board under this statutory provision is to see to it that a compensation carrier which ought to pay into the State Treasury for the benefit of the fund does so. Industrial Accident Board v. Miears, Tex. Civ.App., 227 S.W.2d 571, affirmed in part and reversed on other grounds in part 149 Tex. 270, 232 S.W.2d 671. In the instant case the pleadings of the parties presented conflicting contentions concerning the status of Ford at the time of his death. It was variously contended that he was an independent contractor, a general employee of Coleman County Electric Co-operative, Inc. and a borrowed employee of Maxwell Drilling Company; that he was an employee of Coleman County Electric Co-operative, Inc. alone, and that he was an employee of Maxwell Drilling Company alone. Since the board has the duty to see to it that a compensation carrier which ought to pay funds into the State Treasury for the benefit of the second injury fund does so, it has the right to participate as an active litigant in a proper suit to accomplish that purpose. Industrial Accident Board v. Texas Employers' Insurance Ass'n (Sup.Ct.), 345 S. W.2d 718.

It was found by the jury that Ford at the time of his death was an employee of Coleman County Electric Co-operative, Inc. and was acting within the scope of such employment. Appellant Traders & General Insurance Company contends in points 2 through 7 that there is no evidence to support such findings and in the alternative that such findings are so against the great weight and preponderance of the evidence as to be the result of bias and prejudice. The jury also found in answer to special issue number 19 that Ford at the time of his death "was not working as an independent contractor." Appellant Traders & General Insurance Company urges in points 8 and 9 that the undisputed evidence shows that Ford was an independent contractor at the time of his death, and that the answer to special issue number 19 is without any support in the evidence or in any event that the evidence is insufficient to support such

finding. It also contends in the alternative in points 11 and 12 that the court erred in granting the motion of Texas Employers' Insurance Association to disregard the findings of the jury in answer to special issues numbers 3 and 4 to the effect that Ford was a borrowed employee of Maxwell Drilling Company and was at the time of his death acting within the scope of such employment.

■ It is undisputed that Ford at the time of his death was an employee of Coleman County Electric Co-operative, Inc., although it is contended that he was not engaged in such employment. It is also undisputed that he was dynamiting a slush pit for Maxwell Drilling Company. The evidence shows that Ford had worked for the Co-operative for several years prior to his death; that he was a lineman helper, truck driver, hole digger and a lead ground man. He worked for the Co-op 5 days a week Monday through Friday. The evidence further shows that Ford and a fellow worker, Snow, did dynamiting for the Co-op; that the Co-op would upon request occasionally allow its equipment to be used by its employees for other concerns in that area who desired to have blasting done. Mr. McKinley an employee of Maxwell Drilling Company had called Mr. Brandt, the line superintendent, of Coleman County Co-operative, Inc., to see if some one was available to do blasting work on a pit which Maxwell desired to be dug at a drilling location. Brandt told McKinley that the Co-operative didn't do blasting work for others but that he would contact some of the employees of the Co-op to see if they wanted to do the work for Maxwell. Brandt then contacted Snow, Snow contacted Ford, and Brandt was advised that Snow and Ford would do the work. Brandt arranged for Snow and Ford to meet McKinley at the Co-operative warehouse. He did not order or direct them to do the work but told them they could do it if they wanted to and that the Co-op would allow them to use the truck and other Co-op equipment including the detonator to be used for dynamiting, which was according to the custom of the Co-op

in such cases. Thereafter on Sunday morning of September 12, 1954, Snow and Ford met McKinley in Coleman and were taken to the location of the slush pit where the fatal injury occurred soon after the work began. McKinley told them where he wanted the pit and advised them that he wanted it to be 4 feet deep. No one directed the manner of the performance of the work of Snow and Ford in blasting the pit. They themselves determined all the details of the blasting work including what hours they worked, how many holes they drilled, where the holes were drilled, how they were spaced, how many sticks of dynamite they would use in each hole, how many charges would be fired at one time, how and when the charges would be detonated and how far away to go during the blasting. No one with the Co-operative had anything to do with the manner in which Snow and Ford performed their work on the Maxwell lease, and the work was done on a week end after they had completed their 5 day work week with the Co-op. The evidence does show, however, that the equipment used by Snow and Ford was the property of, and used with the consent of, the Co-operative and was subject to their control and management. Although Snow and Ford set their own prices for their labor, they turned the charges into the Co-operative. The Co-op paid them and then billed Maxwell therefor in full including Social Security which the Co-op paid on Ford's services during the time he was engaged in this work. The Co-op also withheld taxes from the amount due Ford. The uncontradicted evidence shows that the Co-op carried Workmen's Compensation Insurance on Ford as one of its employees. The evidence also shows that the Co-op charged Maxwell for the use of its equipment. Appellant Traders & General Insurance Company's points 2, 3, 4, 5, 6, and 7 and its points 11 and 12 are not well taken. There is in our opinion ample evidence to support the findings that Ford was not an independent contractor at the time of his death; that on the contrary the general relationship of employer and employee still

existed between the Co-op and Ford. We also hold that such findings are not against the great weight and preponderance of the evidence. Appellant Traders & General Insurance Company's contentions in this respect have been adversely determined in Insurors Indemnity & Insurance Co. v. Pridgen, 148 Tex. 219, 223 S.W.2d 217, a case in which the facts are strikingly similar to those of the instant case. In that case a quotation from Restatement of the Law, Agency, Under Sec. 227 at page 501 et seq. is set out as follows:

"A continuation of the general employment is indicated by the facts that the general employer may at any time substitute another servant, that the time of employment is short, and that the lent servant has the skill of a specialist.

"A continuance of the general employment is also indicated in the operation of a machine where the general employer rents the machine and a servant to operate it, particularly if the instrumentality is of considerable value. Normally, the general employer expects the employee to protect his interests in the use of the instrumentality and these may be divergent from the interests of the temporary employer. If the servant is expected only to give results called for by the temporary employer and to use the instrumentality as the servant would expect his general employer would desire, the original service continues. Upon this question, the fact that the general employer is in the business of renting machines and men is relevant, since in such case there is more likely to be an intent to retain control over the instrumentality * * *."

The evidence supports the conclusion that at and prior to the time of Ford's death it was the customary practice of Coleman County Electric Co-operative, Inc., to lease its equipment when it was convenient to do so to concerns or individuals which needed it on a "fully operated basis." This practice was considered a matter of vital and controlling importance in the determination of the Pridgen case. In the instant case the employees who did the work for Maxwell were volunteers but their selection was under the control of the Co-op which at any time could substitute another of its employees. The loaned employees were skilled in the work they were doing and such work required the use and operation of the special equipment leased by the Co-op to Maxwell. The time of employment with Maxwell was short. The Co-op, in lending its skilled employees necessary in the operation of its leased equipment, was definitely interested in and had the right to control the work at least to the extent of the manner of use of their equipment. In this connection Judge Garwood, speaking for our Supreme Court in the Pridgen case stated as follows:

"by reason of his status and the understanding of all parties that the machine was leased 'fully operated', Smith had and, without need of word or specific act, exercised control of the details of management of the machine. Certainly there was no agreement that he would not do so or that Shipyard or Somnier would do so in preference to him. For Smith to retain control over his own machine and his own employee as to the details of operation, it was not essential that he be in charge of the general aspects of the work or have any contract at all with Shipyard."

■ The evidence is not in dispute concerning the relationship of the deceased Ford to Maxwell Drilling Company. The evidence shows that the pit to be blasted belonged to Maxwell and that an agent of Maxwell showed Ford and Snow where the pit was to be dug and instructed them as to the desired depth. There was no evidence tending to show that Maxwell directed or had the right to direct the details of how the work was to be accomplished. The only interest of Maxwell was to secure the digging of the pit according to certain specifications. Under these circumstances

the evidence, as a matter of law, does not show a borrowed employee. Insurors Indemnity & Insurance Co. v. Pridgen, supra; Travelers Insurance Company v. Ray, Tex. Civ.App., 262 S.W.2d 801, (error refused); Shannon v. Western Indemnity Co., 257 S.W. 522 (Tex.Com.App.); Goodwin v. Wilhelm Steel Const. Co., Tex.Civ.App., 311 S.W.2d 510, (Ref.N.R.E.). The court did not err in granting the motion of Texas Employers' Insurance Association to disregard the finding of the jury to the effect that Ford was a borrowed employee of Maxwell Drilling Company at the time of his death and was then acting within the scope of such employment.

We have carefully examined all points urged by all appellants herein and find no

The judgment of the trial court is af-reversible error.
firmed.

WALTER, J., disqualified and not sitting.